IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BECKY L. LEE,

        Plaintiff,

                                   1:15-CV-00-917-PK

v.                                  OPINION AND
                                  ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendants.

PAPAK, Magistrate Judge:

        Plaintiff Becky Lee filed this action October 20, 2015, seeking judicial review of the

Commissioner of Social Security's final decision denying her application for both disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act") and supplemental

security income ("SSI") under Title XVI of the Act. This Court has jurisdiction over Lee's action

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

        Lee advances five substantive arguments in response to the findings of the ALJ: 1) that

the ALJ improperly substituted his own opinion for that of Lee's treating and examining medical

Page 1 - OPINION AND ORDER

sources of record; drew his own independent medical findings, and made speculative inferences from the medical evidence; 2) that the ALJ did not properly evaluate the combined effect of the Lee's medically verified impairments or consider whether taken together they resulted in limitations equal in severity to those enumerated in the Listings (20 C.F.R. Part 404, Subpart P, Appendix 1) or resulted in limitations of disabling severity; 3) that the ALJ improperly rejected the opinions and ultimate conclusions of Lee's treating physicians without stating clear and convincing reasons that were supported by substantial evidence in the record; 4) that the ALJ's decision was in error because it turned on a specific quantum of supporting evidence, viewed in isolation and without consideration of the record as a whole; and 5) that the ALJ rejected Lee's pain and other subjective symptom testimony without making specific findings supported by clear and convincing reasoning. I have considered the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.*

Page 2 - OPINION AND ORDER

*Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

Page 3 - OPINION AND ORDER

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

Page 4 - OPINION AND ORDER

disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

Page 5 - OPINION AND ORDER

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Lee was born June 23, 1963. Tr. 60[3]. She received a high school diploma and a college degree, and began pursuit of a master's degree. According to the evidence of record, prior to her claimed disability onset date of September 15, 2011, Lee had worked as a sales associate, rental agent, customer service representative, nursing assistant, bank teller and cashier. Tr. 56-57, 187-197, 260-261. Following the alleged onset of her disabilities, Lee continued work until January 29, 2012, however, the ALJ found that this did not constitute substantial gainful activity within

---

[2] The Following recitation constitutes a summary of the evidence contained within the Administrative record, and does not reflect any independent finding of fact by the Court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 15.

the meaning of the Act. Tr. 22, 203.

Lee alleges disability due to pathologies involving her back, hip, leg, arm, wrist, and hand. Tr. 204. Of these, the dominant pathology is acute degenerative disc disease affecting the vetebral column between the third lumbar (L3) and first sacral vertebra (S1). Tr. 24, 204, 308, 332. In February 10, 2000, Lee underwent an anterior posterior lumbar fusion surgery from L4 to the sacrum. Tr. 332, 366, 464, 475, 480, 484. Lee then returned to work. Tr. 260-274.

On January 15, 2009, Lee suffered injuries to her left hip, buttock and thigh from a fall. Tr. 370. Having sustained a laceration of the left lateral ankle and a left leg hematoma, Lee sought treatment for her injuries with Dr. Adrian Sue. Dr. Sue diagnosed Lee as suffering from cellulitis. However, noting a persistent tingling feeling radiating down her left leg and into her foot, Dr. Sue referred Lee to Ashland Orthopedic Associates to determine if her symptoms were related to her lower back and spine. Tr. 370-71

Dr. Glen O'Sullivan, an orthopedic spine surgeon, examined Lee on April 27, 2009. Tr. 370, 534-541. As a part of this exam, Dr. O'Sullivan conducted an imaging study of Lee. Tr. 370. Following analysis of that study, Dr. O'Sullivan diagnosed Lee as suffering from a sprain/strain injury of the lower left hip and lower extremity, contusion, and left trochanteric bursitis. Tr. 370. Comparing current and post surgical images of Lee's fusion site, Dr. O'Sullivan noted that there appeared to be "no significant apparent changes on the radiographs." Tr. 370. Dr. O'Sullivan observed that the Lee did not appear to be in acute distress though she had a slight antalgic gait affecting her left lower extremity. Tr. 370.

Just before 11 p.m. on March 20, 2010, Lee presented to the Rogue Valley Medical Center Emergency Department complaining of pain in her left back, left buttock and lower

Page 7 - OPINION AND ORDER

extremities. Tr. 347. Lee rated her pain at 10 out of 10 on the VAS scale. Tr. 347. The clinical

impression of treating physician Dr. Eric Jensen, M.D., was that Lee was suffering from

intractable pain due to acute exacerbation of sciatica. Tr. 350. Aside from residual interbody

devices and pedicle screws, X-rays of Lee's lumbar and thoracic vertebrae were unremarkable.

Tr. 350, 359. Despite being treated with opioid pain medications, toradol, and decadron, and

despite showing normal reflexes on repeated extremity evaluations with normal sensation around

the genitals and buttock, Lee refused to ambulate. Tr. 350. Expressing a desire to remain at the

hospital, Lee was referred to Dr. Ken Sanford, M.D., to be evaluated for admission. Tr. 350.

While being evaluated, Lee experienced a change of mind, deferring her admission so that she

could be discharged from care and return home, stating that she would simply "limp through her

pain." Tr. 350. Lee left Rogue Valley Medical Center just after 2 a.m. in "stable and improved

condition." Tr. 350.

     Due to her continuing severe and persistent headaches, Dr. Sue referred Lee to Dr. Oscar

A. Sanchez, M.D., for a neurological evaluation. Tr. 417. On July 20, 2010, Lee sought

consultation from Dr. Sanchez. At this time, Lee weighed 260 lbs. Tr. 417. Dr. Sanchez's

impression was that Lee was "describing migraine headache without aura.. While she denie[d] a

previous history of migraine, she did have sinus headaches, which [s]he state[d] have not

recurred since the ENT surgical procedure. . . . She d[id] describe migrainous features, with

photophobia, phonophobia, and recurrent similar headache attacks, without chronic/tension or

constant lower occipito-nuchal or frontotemporal discomfort. . . . She ha[d] a pre-existing

amblyopea, and R cataract surgery history. Her examination is normal for the right esotropia and

amblyopia." Tr. 424. Dr. Sanchez ordered an imaging study of Lee and discussed several

Page 8 - OPINION AND ORDER

treatment options with her. Tr. 424.

Dr. Sanchez performed the previously ordered imaging study of Lee on July 19, 2010.

Tr. 391. As a part of this study, a MRI of Lee's brain was conducted. Tr. 391. Upon review of

this MRI, Dr. Sanchez noted that, among other things, the "findings were most suggestive of

chronic microvascular ischemic white matter disease, slightly greater than expected for [her] age.

. . . No abnormal contrast enhancement and no evidence of acute infarct." Tr. 392. Dr. Sanchez

also ordered a detailed blood panel evaluation. Tr. 396-406. Lee tested negative for Lyme

disease. Tr. 396.

On December 15, 2010, Lee sought treatment from Dr. O'Sullivan to address bilateral leg

pain. Tr. 369. On exam, Lee had an antalgic gait in her left leg and a restricted range of motion

in the lumbosacral spine. Tr. 369. Dr. O'Sullivan discussed further treatment options with Lee.

Tr. 369.

Dr. O'Sullivan undertook an imaging study of Lee on January 5, 2011. Dr. O'Sullivan

found that:

> [T]he L3-4 level demonstrates a moderate broad-based disk bulge with left
> paracentral disk protrusion extending into the left neural foramen in combination
> with moderately degenerative facets and ligamentum flavum hypertrophy, and is
> causing moderate central canal stenosis, moderate right and severe left neural
> foraminal narrowing, which by history was the clinically suspected level of
> abnormality.

Tr. 450.

On January 13, 2011, Lee presented to Dr. O'Sullivan for treatment of post lumbar spine

surgical syndrome with a symptomatic herniated disk, stenosis, and radicular leg pain. Tr. 325.

Lee underwent an epidurogram of her lumbar spine. Tr. 326-327. To complete the treatment,

Page 9 - OPINION AND ORDER

Lee's epidural space was infiltrated with local anesthetics. Tr. 327.

Lee met with Dr. O'Sullivan on January 28, 2011, for a follow up assessment and review. Tr. 369. Dr. O'Sullivan noted that Lee continued to be symptomatic, specifically recording that she suffered from bilateral leg pain requiring the use of a cane. Tr. 369. Dr. O'Sullivan reviewed the previously ordered MRI concluding that the Lee had "a herniated disk at L3-L4 with instability above a prior L4-S1 fusion." Tr. 369. Dr. O'Sullivan noted that treatment by both medication and injection had been ineffective thus far. Tr. 369. As Lee was not responding to conservative treatments, she expressed interest in having Dr. O'Sullivan perform a surgical decompression and stabilization of the L3-L4 segment. Tr. 369.

On October 4, 2011, Dr. O'Sullivan performed a spinal decompression and stabilization of the L3-L4 segment to address herniation, stenosis, and instability at and above Lee's prior instrumented fusion. Tr. 238, 332. Using a posterior approach, Dr. O'Sullivan placed pedicle screws, interbody devices and an allograft in between and around the L3 and L4 vetebra to affect a localized fusion of the column. Tr. 336, 338-342.

Lee saw Dr. O'Sullivan for a follow up appointment on October 10, 2011. Tr. 371. Lee reported that she had low back pain and numbness in the left foot and ankle. Dr. O'Sullivan recorded that she was doing well and making progress. Tr. 371.

Lee returned to see Dr. O'Sullivan on October 21, 2011. Tr. 371. Dr. O'Sullivan noted that "she is making slow headway. She has felt increased pain recently in her back and legs with numbness in the legs. She is better now but is quite tearful with back and left buttock pain with numbness in the left shin." Tr. 371. In order to control Lee's problematic back pain, the doctor prescribed duragesic patchs, neurontin, valium and norco. Tr. 371.

Page 10 - OPINION AND ORDER

Dr. O'Sullivan had an imaging study of Lee worked up on November 11, 2011, at Oregon Advanced Imaging. Tr. 446. Dr. O'Sullivan surveyed Lee's symptomatic sacroiliac joints, finding that her "sacroiliac joints demonstrate degenerative changes, as well as postoperative changes of the left iliac." Tr. 448. Dr. O'Sullivan's impression of the degenerative changes in Lee's sacroiliac joint were as follows: "[m]ild, left greater than right, bilateral hip degenerative osteoarthrosis with labral and chondral degenerative change. There is no evidence of acute fracture or osseous lesion." Tr. 448.

Dr. O'Sullivan intervened to address pain in the Lee's lower back and legs on December 15, 2011. Tr. 344. Diagnosing the source of this pain as a result of "[p]es planus syndrome, post L3-L4 instrumentation and fusion with back and radicular leg pain, L3-4, L4-5," Tr. 344, Dr. O'Sullivan treated the pathology by introducing local anesthetic to the fusion site. Tr. 344.

Dr. O'Sullivan performed an assessment and review of Lee on January 6, 2012. Tr. 372. Dr. O'Sullivan reported that Lee had an awkward-appearing station and gait, a restricted range of motion in her lower spine, muscle spasms, and persistent tenderness. Tr. 372. Dr. O'Sullivan prescribed physical therapy for Lee and advised her to take several weeks off of work to rest, heal and recover. Tr. 372.

Lee returned to Dr. O'Sullivan's office for an examination on February 10, 2012. Tr. 372. Dr. O'Sullivan reported that Lee was suffering from "ongoing back, hip, and bilateral leg pain with numbness four months out of surgery with 30% improvement from preop but still symptomatic. I am currently keeping her out of work because of pain. She was recently stacking chairs at church, reached, and had increased pain." Tr. 372. On exam, Dr. O'Sullivan noted that Lee had an antalgic gait, a restricted range of motion in her lumbro-sacral spine, patchy sensory

Page 11 - OPINION AND ORDER

changes and diminished reflexes. Dr. O'Sullivan extended Lee's work release through February

27, 2012, and began to consider additional treatment options including further imaging studies,

injections, and pain management. Tr. 372, 428.

To better manage her ongoing symptoms, Lee sought treatment from Dr. Shawn M. Sills,

M.D. Dr. Sills is a pain specialist with Interventional Pain Consultants LLC in Medford, Or. Tr.

374-389. Lee was referred to Dr. Sills by her surgeon Dr. O'Sullivan. Lee began seeing Dr. Sills

on March 19, 2012, for continued treatment of persistent pain in her lower extremities and the

left side of her buttock. Tr. 374. Dr. Sills treated Lee with caudal epidural steroid injections and

subsequently scheduled a follow up visit with her. Tr. 374. Dr. Sills recorded that Lee exhibited

no substantial weight gain. Tr. 374.

Lee presented to Shireen N. Chamberland, M.D., at the Medford Medical Clinic on

March 29, 2012. Tr. 415. Lee's primary purpose in seeking treatment from Dr. Chamberland

was to address an ongoing illness with symptoms including fevers, chills, sweats, anorexia,

fatigue, malaise, and weight loss. Tr. 416. Lee also complained of depression. Tr. 416. Lee

underwent a general exam and her prescription for celexa was refilled. Tr. 416.

Lee returned to Dr. Sills' office on April 2, 2012, where he administered a left sacroiliac

joint injection. Tr. 376. Lee had reported that her pain was an 8 out of 10 on the VAS scale. Tr.

376. Dr. Sills recorded that he would be willing to take responsibility for managing Lee's

medications. Tr. 376. Lee scheduled a follow up appointment with Dr. Sills. Tr. 376.

On April 3, 2012, Lee protectively filed an application for a period of disability, disability

insurance benefits, and supplemental security income alleging a disability onset date of

September 15, 2011. Tr. 20, 64, 76, 179, 200, 291, and 304. Lee asserted her disability was due

Page 12 - OPINION AND ORDER

to failed back syndrome and obesity, compounded by impairments of her hips, legs, arms, wrists, and hands. Tr. 304.

On April 10, 2012, Lee returned to Dr. Sills complaining of pain arising after the injections she received during the previous week. Tr. 378. Lee remarked that following her previous treatment, she had not been able to put weight on her left foot and was having ongoing pain in her left hip. Tr. 378. Dr. Sills assumed control over her opiate medications as Lee had expressed interest in decreasing her dose. Tr. 378. In his history and physical exam of Lee, Dr. Sills noted that:

> She reports that the first day of the injection was not bad, but the second day she was not able to bear weight on her left leg. She reports that she has had ongoing trouble since she had surgery in October of 2011. She had fallen on her hip in 2009. The area is still swollen. She received care at Valley Immediate Care but no [X]-rays were done. The hip problem was overshadowed when she developed sepsis related to lower extremity cellulitis, and she was hospitalized for 5 days. Then she ruptured a disc in her back and had surgery, which overshadowed her getting help for her hip. By the time the hip x-rays were done, they were normal and there was no indication of what her original injury had been. She has ongoing pain in her left hip. It is a 6 out of 10 on the VAS scale. Associated symptoms include numbness. Ms. Lee is very concerned, as she has been off work for a long period of time. Her boss is becoming frustrated with her, and she goes into some detail regarding her employment history and her work duties. She is in a dilemma about what she is supposed to do and whether she is able to go back to work. . . .

Tr. 378.

On April 14, 2012, Lee underwent an axial X-ray computed tomography (CT) scan at Rogue Valley Medical Center. Tr. 394. Dr. Hubbert compared this CT scan with one taken on July 19. 2010. Tr. 394. Dr. Hubbert found that "[t]he brain is thought to be overall unchanged in size, configuration and gray/white matter differentiation." Tr. 394. Dr. Hubbert's overall impression of the study was that there was "no acute abnormality, mass or mass effect." Tr.

394.

Lee saw Dr. Sue at the Medford Medical Clinic on April 16, 2012. Tr. 412-414. Dr.

Sue prescribed a cane for Lee to use while she was attempting to work. Tr. 414. Addressing

Lee's depressive disorder, Dr. Sue noted that Lee was not experiencing suicidal or homicidal

ideation. Tr. 414. Dr. Sue opined that Lee's celexa was having good affect. Tr. 414.

Lee visited Dr. Sue on May 11, 2012, to follow up with Dr. Sue and discuss her

medications. Tr. 409. Dr. Sue performed a general examination of Lee. Tr. 409. Dr. Sue's

impression of Lee's condition was that "she has weaned down her meds. She cont[inues] with

pain and is attempting work tomorrow with limitations." Tr. 411.

Lee returned to Dr. Sills' office on May 14, 2012, for further treatment. Tr. 380. Dr.

Sills explained the modality of myofascial release to Lee and performed gentle direct release

techniques on her back, lower joints, and extremities. Tr. 380. Dr. Sills noted that Lee was

walking "very slowly and gingerly and with a cane . . . and winces in pain with almost any

movement." Tr. 380. Dr. Sills decided to begin seeing Lee weekly. Tr. 381.

Lee presented to Dr. Sue on May 17, 2012, for a follow up appointment. Tr. 406. Dr.

Sue's report lists Lee's current medical diagnoses as "toxic effect of venom, chronic back pain,

moderate depressive disorder, abnormal MRI of brain, headache, migraine, and unspecified

congenital cataract." Tr. 406. Dr. Sue recorded that Lee "[had] persistent back pain and

numbness in the leg, s/p surgery. She is continuing with pain management. She has not been

able to work due to pain. She feels she might be able to do desk work but will need to be able to

sit/stand if needed." Tr. 408.

On May 30, 2012, Dr. O'Sullivan gave Lee a release from work for one year. Tr. 366,

427. In determining that Lee was unable to work, Dr. O'Sullivan opined:

> Lee continues to have low back pain following decompression and stabilization
> L3-L4 above a two level fusion L4 to the sacrum. She still has difficulty bending
> and stooping. She cannot lift more than five pounds. She described bilateral hip
> pain, left greater than right. She underwent physical therapy at Wellness
> Recovery. She has difficulty weight bearing with left hip pain. She applied for
> disability with a parking permit. She cannot return to work. She is eight months
> out from surgery but is a candidate for SSDI. ON EXAM, she appeared in
> distress with an antalgic gait. Restricted range of motion of the lumbosacral spine
> with muscle spasm[s] and tenderness. Neurologically globally intact in the lower
> extremities with patchy sensory changes and diminished reflexes. Straight leg
> raise test equivocal. Vascular exam was normal. IMPRESSION, 1) Status post
> L3-L4 fusion above L4 to S1 fusion with persistent mechanical pain, potentially
> facet mediated vs persistent pain vs SI joint mediated.

Tr. 366.

Lee's credibility was put in issue on June 5, 2012. At Interventional Pain Consultants,

Dr. Sills noted that Lee was capable of driving, exiting a vehicle easily, and walking to the

treatment facility without the aid of a cane. However, upon entering the clinic, Lee altered her

gait to appear as though she were unable to walk without the assistance of a cane. Tr. 65, 384.

Dr. Stills reported that:

> Prior to the session today I happened to notice Ms. Lee arrive in the parking lot.
> She appeared to exit her car fairly quickly and easily and opened the back door to
> get her cane, which she carried toward the clinic door. Once inside, she began to
> walk slowly and gingerly, using the cane. I noticed a similar phenomena when
> she left. She walked gingerly down the hall, but when she left the clinic, she
> walked pretty easily, opened the car and tossed the cane in and got into her car
> pretty easily as well.

Tr. 384.

The following day, Lee returned to Interventional Pain Consultants and presented to

Mary Heubner for a medication refill. Tr. 386. Ms. Heubner noted that: "[Lee's] first words

today were[:] 'Dr. O'Sullivan has me on restrictive activity for the next year,' which was

Page 15 - OPINION AND ORDER

interesting because I did not ask, but I have the impression that she has secondary gain somewhere along the line, but we did not discuss that." Tr. 386. Ms. Heubner concluded her report with the observation that: "[Lee] has not been happy with the care she has received in our clinic. It is not likely we will see her back." Tr. 387.

Notwithstanding Ms. Heubner's prediction, Lee returned to Interventional Pain Consultants on June 12, 2012, to see Dr. Sill. Dr. Sill observed that: "[Lee] states she can hardly put any weight on her right leg. Her pain is much more on the right now, though it was on the left side with her first treatment." Tr. 388.

Upon the recommendation of Dr. O'Sullivan, Lee began seeing Dr. Mark Greenberg, M.D., at Advanced Pain Care in Ashland, Oregon. Tr. 463-470. On July 3, 2012, Dr. Greenberg examined Lee. Tr. 463-470. Dr. Greenberg recorded that Lee's neurological exam was remarkable only for numbness in her shins. Tr. 466. Dr. Greenberg also recorded that Lee's reflexes were normal, that Lee's muscle strength in both her upper and lower extremities was normal, that her joints appeared to be in normal condition, that her station was normal, and that she walked with some difficulty. Tr. 463-470. Lee and Dr. Greenberg discussed the etiology of Lee's pain and potential treatment options. Tr. 470. Dr. Greenberg noted that he "agrees that L3-4 is a potential pain generator, with adjacent segment disease." Tr. 471. Having determined that Lee was not a candidate for surgery, Dr. Greenberg provided Lee with a video about spinal cord stimulators and a few informational pamphlets. Tr. 471.

The following week, on July, 11, 2012, Lee returned to Dr. Greenberg's clinic for continuing care. Tr. 472. Dr. Greenberg administered a lumbar steroid injection via a transforaminal approach around the L2-3 vertebrae. Tr. 472.

Lee returned to Dr. Greenberg's clinic on July 18, 2012, for additional treatment. Tr. 474. Dr. Greenberg opined that Lee's main diagnosis was lumbar post-laminectomy syndrome. Tr. 476. Dr. Greenberg rated Lee a 62.22 on the Oswestry Disability Index. Tr. 474. Lee was instructed to return to Dr. Greenberg's office the following week. Tr. 479.

Lee returned to Dr. Greenberg's office on July 25, 2012. Tr. 480. In his assessment of Lee, Dr. Greenberg noted that: "[p]atient is severely debilitated by pain, she states 'I cannot live this way.' Significant component of leg pain in addition to back pain. She has failed trials with injections, surgery and meds. Would like to proceed to SCS [spinal cord stimulator] trial." Tr. 480. On the Oswestry Disability Index, Dr. Greenberg rated Lee's impairments as a 73.33 out of 100. Tr. 479.

On August 8, 2012, Lee returned to Dr. Sue's office to be screened for unspecified endorcrine, nutritional, metabolic, and immunity disorders. Tr. 508-518.

On September 20, 2012, Lee sought treatment at Advanced Pain Care for the final time. Tr. 484. Dr. Greenberg assigned Lee a 54.00 out of 100 on the Oswestry Disability Index. Tr. 484. Dr. Greenberg noted that: "[i]nsurance coverage has created an intractable situation [by] disallowing appropriate treatment for this patient." Tr. 484. Dr. Greenberg's primary diagnosis remained unchanged: lumbar post-laminectomy syndrome. Tr. 485.

In gathering evidence for a formal determination of disability, Dr. O'Sullivan completed and returned a residual functional capacity questionnaire dated October 12, 2012. Tr. 487. Due to her diagnosed post lumbar spine surgical syndrome, alleged by Dr. Sullivan to have begun as early as March of 2010, Dr. O'Sullivan determined that Lee was in constant pain. Tr. 487. Dr. O'Sullivan opined that the severity of Lee's pain would prevent her from performing even simple

Page 17 - OPINION AND ORDER

work tasks. Tr. 487-491. Dr. O'Sullivan additionally indicated that Lee was exertionally limited.

Tr. 487-491. Dr. O'Sullivan determined that Lee should not sit for more than 15 minutes, stand

for more than 20 minutes, and should only occasionally lift more than 10 pounds or climb stairs.

Tr. 487-491. Dr. O'Sullivan opined that Lee should neither sit nor stand for more than 2 hours in

an 8 hour work day. Tr. 487-491. Ultimately, Dr. O'Sullivan concluded that Lee's impairments

would cause her to miss more than four work days per month. Tr. 487-491. Lee also sought

treatment from Dr. O'Sullivan on this occasion. Tr. 525. Dr. O'Sullivan noted in his records that

Lee's prognosis was poor and that he was unsure about how to effectively manage Lee's pain. Tr.

525.

Lee self-referred to the Spine Center at Oregon Health & Sciences University on

December 13, 2012. Tr. 526. Dr. Sibell, a pain management specialist, reviewed a previous

imaging study of Lee. Tr. 526. In reviewing these images, Dr. Sibell found "postoperative

fusion and laminectomy involving the lower lumbar spine, without MR evidence of abscess

formation or postoperative complication. There is no high-grade central canal stenosis or

foraminal narrowing. The previously seen postoperative fluid collection at the L3-4 level has

near[ly] completely resolved." Tr. 527-533. Dr. Sibell advised Lee that her spinal condition was

unlikely to resolve on its own. Tr. 530. Dr. Sibell consulted Lee on further treatment options

and made medication recommendations to Lee's other treating physicians. Tr. 530.

On January 30, 2013, Lee visited Dr. O'Sullivan for treatment. Tr. 524. Dr. O'Sullivan

observed that Lee was "having increasing back pain and radiation into her right hip, thigh, and

leg down the left side. She can only tolerate 5 minutes of walking with a cane." Tr. 524. Dr.

O'Sullivan concluded that Lee was unable to return to work as she continued to suffer from post

Page 18 - OPINION AND ORDER

lumbar spine surgical syndrome. Tr. 524.

On February 27, 2013, Lee presented to Dr. Sue for a controlled substance visit. Tr. 503. Lee and Dr. Sue reviewed the dosages, effectiveness and side effects related to her current battery of medications. Tr. 503.

Lee saw Dr. O'Sullivan on June 7, 2013. Tr. 523. Dr. O'Sullivan suggested that Lee may be suffering from additional degenerative pathologies affecting segments in both her cervical and thoracic spine. Tr. 523. Dr. O'Sullivan recommended that Lee be evaluated by Dr. Bobek. Tr. 523.

On June 18, 2013, Lee underwent an MRI of her cervical, thoracic and lumbar spine at Oregon Advanced Imaging. Tr. 547-562. Dr. John Simmons' impression of these images was that there is mild to moderate multilevel discogenic and facet degenerative disease at multi-levels in the cervical spine, that there is no central canal stenosis in the thoracic spine and that there is no central canal stenosis or foraminal narrowing in the lumbar spine. Tr. 547-562.

On June 26, 2013, Lee sought treatment from Dr. Sue for swelling in her legs and persistent peripheral neuropathy. Tr. 492-494. Dr. Sue ordered a lab work up of Lee to further develop her diagnosis of the presenting pathologies. Tr. 492-494, 510-518.

On August 9, 2013, Lee saw Dr. O'Sullivan for treatment. Tr. 546. Dr. O'Sullivan opined that: "I cannot see her returning to the work force including inability to do sedentary tasks. She is a candidate for disability and we are having a hard time managing the pain including with pain management." Tr. 546.

On August 22, 2013, a hearing was held before an ALJ in connection with Lee's DIB and SSI applications. Tr. 34-59. Appearing at the hearing were Lee, her counsel, and vocational

Page 19 - OPINION AND ORDER

expert Alan Boroskin. Tr. 34-59. Lee testified that following her lumbar fusion in 2012, she was never able to regain feeling in her left leg and that she has been in continual pain ever since the operation. Tr. 43. Lee testified about both her symptoms and treatment history. Tr. 40-55. The vocational expert gave testimony about Lee's prior work history and ultimately concluded that if, in a hypothetical scenario, Lee were limited to work at a sedentary exertional level, given the opportunity to alternate between sitting and standing, and not off task for more than 10% of the workday, she would be capable of performing work in the national economy. Tr. 57-58.

On August 29, 2013, Lee submitted additional medical records to the ALJ, requesting that they be considered. Tr. 544-562. These records were accepted by the ALJ and incorporated into the administrative record. Tr. 544-562.

After reviewing the facts of Lee's case, Administrative Law Judge Kyle Andeer found that Lee was not disabled within the meaning of the Act. Notice of the ALJ's decision was sent to Lee on September 13, 2013. Tr. 17-33.

Lee gave notice of her intent to appeal the ALJ's denial of DIB and SSI benefits on November 12, 2013. Tr. 15-16. Included with this notice was a request for an extension that would allow Lee to brief her appeal. Tr. 15-16

The Appeals Council notified Lee on March 27, 2015, that they had found no reason under their rules to review the ALJ's decision. Tr. 1-6. The Appeals Council found that the ALJ had not abused his discretion, that there was no error of law, that the ALJ's decision was supported by substantial evidence, that there were no procedural or policy issues that might affect the public interest, and that they had not received any new or material evidence that was contrary to the weight of the record. Tr. 2. This appeal followed.

Page 20 - OPINION AND ORDER

## SUMMARY OF ALJ'S FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found that Lee did not engage in substantial gainful activity at any point following her claimed disability onset date of September 15, 2011. Tr. 22. The ALJ found that Lee met the insured status requirements of the SSA through December 31, 2016, therefore, he proceeded appropriately to the second step of the analysis. Tr. 22.

At the second step, the ALJ found that Lee's impairments, failed back syndrome and obesity (20 CFR 404.1520(c) and 416.920(c)), were severe for the purposes of the Act. Tr. 22. The ALJ found that Lee's alleged disabilities due to pathologies of the hips, legs, arms, wrists, and hands were not severe for purposes of the Act. The ALJ found that Lee's recurring headaches were not a severe impairment. Finally, the ALJ found that, based upon he objective medical evidence of record, the depressive component of Lee's claim was not severe. Tr. 23. Because the impairments resulting from Lee's obesity and failed back syndrome were deemed severe, the ALJ appropriately proceeded to the third step of the analysis.

At the third step of the analysis, the ALJ found that none of Lee's impairments, individually or in combination, meet or medically equal the severity of any impairment enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 23. Specifically, the ALJ found that Lee's failed back syndrome did not meet listing 1.04 (disorders of the spine) because the evidence of record did not establish the requisite nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, that Lee's hip and wrist pain did not meet listing 1.02 (major dysfunction of a joint), and that the depressive component of her pathologies did not meet listing 12.04 (affective

Page 21 - OPINION AND ORDER

disorders). Tr. 23.

Between step three and step four, the ALJ found that Lee had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except that Lee needs to alternate between sitting and standing, should not climb ladders, ropes, or scaffolds; should only occasionally climb stair and ramps; and should only occasionally stoop, crouch, kneel or crawl. Tr. 23-29. In making these findings, the ALJ considered all of the material medical evidence in the record bearing upon Lee's asserted impairments, as well as Lee's own statements regarding her symptoms. Tr. 23-29.

At the fourth step, the ALJ found that in light of Lee's age, education, work experience, and residual functional capacity, she is capable of performing her past relevant work as a customer service representative, as this work does not require the performance of work related activities precluded by Lee's residual functional capacity (20 C.F.R. 404.1565 and 416.95). The ALJ found Alan Borskin's testimony persuasive, agreeing that Lee can perform her past work as a customer service representative. Tr. 28

On this basis, the ALJ concluded that Lee has not been under a disability, as defined in the Act, from September 15, 2011, through the date of his decision rendered on September 13, 2013. Tr. 17-29.

## ANALYSIS

### I.     The ALJ Properly Found That Lee Was Not "Fully Credible"

Lee argues that the ALJ erred by rejecting her pain and other subjective symptom testimony without making specific findings supported by clear and convincing reasons for doing so. *See* Plaintiff's Brief, Doc. #16, pg. 19. Specifically, Lee asserts that because the ALJ did not

Page 22 - OPINION AND ORDER

identify specific testimony found not to be credible and did not articulate clear and convincing

reasons for rejecting such testimony the ALJ's determination that Lee was less than credible is in

error. Plaintiff's Brief, Doc. #16, pg. 19.

    In determining whether to credit a claimant's subjective symptom testimony, the ALJ

must engage in a two step analysis. *See Smolen,* 80 F.3d 1281 (9th Cir, 1996). At the first step, a

plaintiff must produce objective medical evidence of an underlying impairment and, at the

second step, demonstrate that the impairment, taken alone or in combination with other

impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1284. If

this test is satisfied and the ALJ's credibility analysis shows no malingering, the ALJ may reject

the claimant's testimony about the severity of symptoms if "specific findings stating clear and

convincing reasons for doing so[]" are given. *Batson,* 359 F.3d 1196 (9th Cir. 2004) (quoting

*Smolen,* 80 F.3d at 1284).

    The ALJ found that Lee produced objective medical evidence of impairments and that

these impairments could reasonably be expected to cause the symptoms Lee has alleged. Tr. 22-

26. After consideration of the evidence, however, the ALJ found that "claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible[.]" Tr. 24. The ALJ supports his credibility finding by explaining that:

> there is evidence of acting and malingering. For instance, Dr. Sills, a pain
> specialist, noticed that when the claimant arrived in the parking lot, she exited her
> car very quickly and easily; opened the back door to get her cane, which she
> carried toward the clinic door; and that she began to walk slowly and gingerly
> using the cane once inside the clinic. Apparently, the claimant repeated this
> phenomena when she left: walked gingerly down the hall; when left the clinic,
> walked pretty easily; opened the car door to toss in the cane; and got into her car
> 'pretty easily' (exhibit 5f/12 [Tr. 384]). The physician's assistant also commented
> that the claimant has a 'secondary gain somewhere along the line' (Exhibit 5F/14

Page 23 - OPINION AND ORDER

[Tr. 386]). Therefore, the undersigned finds the claimant only partially credible.
Tr. 27-28.

In his credibility determination, the ALJ found both Dr. Sills' and Ms. Huebner's statements to be affirmative evidence of malingering. While Lee disputes this finding, when evidence can be reasonably construed to either confirm or reverse the ALJ's decision, the court may not substitute its judgement for that of the ALJ's. *See Tackett*, 180 F.3d 1098 (9th Cir. 1999). Furthermore, because the ALJ found evidence of malingering, the clear and convincing standard that Lee argues is required for an appropriate credibility determination does not apply. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). An affirmative finding of malingering by the ALJ alters the burden of proof required to justify a credibility determination. Because the ALJ found evidence of malingering in the record, the ALJ need only cite specific and legitimate reasons to reject Lee's testimony. *See Batson*, 359 F.3d 1196 (9th Cir. 2004).

Lee argues that the ALJ's credibility findings lack a substantial evidentiary basis. Plaintiff's Brief, Doc.#16, pg. 26-29. In part, Lee asserts that Ms. Huebner's opinion that "[Lee] has a secondary gain somewhere along the line[,]"expresses an unsubstantiated negative attitude toward Lee and should have been excluded from the ALJ's analysis. Tr. 386. Plaintiff's Brief, Doc. #16, pg. 27. Even if, as Lee asserts, Ms. Huebner's statements, when taken in isolation, are not demonstrative of malingering, the ALJ's ultimate credibility determination is still supported by substantial evidence.

The ALJ enumerated a number of specific and legitimate reasons, based on substantial evidence, to support his findings. The ALJ noted that Lee's stacking of chairs at church,

Page 24 - OPINION AND ORDER

completion of two semesters of graduate education, and affirmative evidence of malingering as reported by Dr. Sills, when taken together, constitute substantial evidence that Lee was only partially credible. When the record is considered as a whole, there is significantly "more than a mere scintilla" of evidence to support the ALJ's determination. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). Dr. Sills' characterization of Lee's actions as she approached, entered and left the pain clinic on June 5, 2012, is particularly probative. Taken alone, Dr. Sill's statements concerning his encounter with Lee on June 5, 2012, provide a sufficient evidentiary basis for the ALJ's credibility determination. While Lee argues that she was not given a full opportunity to address Dr. Sills' observations at her hearing, the record indicates otherwise. Plaintiff's Brief, Doc. #16, pg.26-27. The ALJ specifically questioned Lee about the reports from Dr. Sills and Ms. Huebner and Lee's counsel specifically addressed these reports. Tr. 44-46. Because the ALJ's credibility determination is supported by specific and legitimate reasons (as discussed above), the court may not disturb his finding, and Lee's assignment of error in his failure to find her credible provides no grounds for reversing the Commissioner's final decision.

## II.    The ALJ Properly Weighed Opinion Evidence

### A.    Treating Physicians

The ALJ must consider all medical opinion evidence. 20 C.F.R. § 404.1527(b). The medical opinion of a claimant's treating physician is entitled to "special weight" because the treating physician is "employed to cure and has a greater opportunity to know and observe the patient as an individual." *Rodriguez v. Bowen,* 876 F.2d 759, 761 (9th Cir. 1989). While the ALJ is not bound by the opinion of a treating physician, the ALJ must provide "specific and legitimate reasons" for rejecting the opinion of a treating physician. *Lester v. Chater,* 81 F.3d 821, 830–31

Page 25 - OPINION AND ORDER

(9th Cir.1995). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings." *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989). Ultimately, the ALJ is the "final arbiter with respect to resolving any ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

The ALJ found that Lee has the residual functional capacity to perform sedentary work. Lee argues that, in reaching that finding, the ALJ improperly rejected the opinions and ultimate conclusions of Lee's treating and examining physicians without providing clear and convincing or, at least, specific and legitimate reasons supported by substantial evidence for doing so. Plaintiff's Brief, Doc. #16, pg. 15-16. Specifically, Lee asserts that the ALJ erred by giving less than great weight to the opinions and ultimate conclusions of Dr. O'Sullivan. Plaintiff's Brief, Doc. #16, pg. 18-19.

To support his finding that Lee's longitudinal medical history was not consistent with the alleged severity of her impairments, the ALJ set forth a detailed and thorough summary of the relevant facts and noted a number of contradictory findings. Tr. 24-27. For example, on November 20, 2011, Lee presented to the emergency room with right hip pain and sciatic area pain notwithstanding that X-rays of Lee's hip were negative and physical examination revealed no sensory deficits in the lower extremities, normal leg strength, and normal reflexes though some tenderness was reported around the lumbar spine. Tr. 24, 357-358. In February 2012, Lee complained of increasing pain after stacking chairs at church, but because X-rays were negative, the source of her pain was recorded as "not clear." Tr. 25, 367. Additionally, an MRI resulting from this encounter demonstrated improvement from the previous scan and provided no

Page 26 - OPINION AND ORDER

significant findings indicating the source of Lee's pain. Tr. 25, 445. In April 2012, Dr. Sue's examination of Lee was remarkable only for tenderness in the lumbosacral area. Tr. 26, 412. An MRI of Lee's lumbar spine dated June 18, 2013, failed to demonstrate any remarkable nerve impingement. Tr. 27, 547-555. Dr. Simmons' impression of Lee's lumbar spine, as represented in this MRI, was that: "[t]here is no evidence of complication. No central canal stenosis or foraminal narrowing [can be] identified." Tr. 551. This MRI also showed hat Lee's cervical spine was remarkable only for mild canal stenosis, in contradiction to a treating physicians finding of "severe canal stenosis." Tr. 27, 543. With regard to Dr. O'Sullivan's opinions contained within the residual functional capacity questionnaire, the ALJ found that Dr. O'Sullivan's opinion that the onset of Lee's disability occurred in March of 2010 to be at odds with Lee's earning statements. Tr. 27, 199. Lee's earning statements, indicating that Lee engaged in substantial gainful activity through 2010 and into 2011, contradict Dr. O'Sullivan's opinion that the onset of Lee's disability occurred in the spring of 2010. Tr. 27, 199. The ALJ also found that Dr. O'Sullivan's residual functional capacity questionnaire as well as his overall impression of Lee's condition to be at odds with Dr. Greenberg's assessment of Lee. Tr. 27. Contrary to Dr. O'Sullivan's findings, Dr. Greenberg found that Lee's reflexes were normal, that Lee's strength in her upper and lower extremities was undiminished, that her joints appeared to be normal, and that even though she walked with some difficulty her station was normal. Tr. 465-471. Collectively, the ALJ's analysis is thorough, spanning the entirety of Lee's longitudinal medical history, is detailed, and supports the reasonable conclusions of the ALJ.

The ALJ provided a rational interpretation of the evidence and supported this interpretation with specific and legitimate reasons. The ALJ laid out a detailed and thorough

Page 27 - OPINION AND ORDER

summary of the facts and conflicting medical evidence, stated his interpretation of this evidence,

and made his findings from it. The reasoning set forth in the ALJ's decision provides sufficient

guidance for this Court to determine that the ALJ appropriately weighed Dr. O'Sullivan's

testimony. Therefore, no error inheres in the weight given to the evidence provided by Lee's

treating physicians and Lee's assignment of error provides no grounds for disturbing the

Commissioner's final decision.

## B.    Weight Given to Lay Witness Testimony

Lee argues that the ALJ failed to meet the legal standard for rejecting the testimony of a

lay witness. The ALJ found the third party function report, completed by Lee's friend Leigh

Eastwood, to be unpersuasive. Lee asserts that in rejecting Ms. Eastwood's testimony, the ALJ

failed to give specific reasons germane to the witness. See *Bruce v. Astrue*, 557 F.3d 1113, 1115

(9th Cir.2009). "In determining whether a claimant is disabled, an ALJ must consider lay

witness testimony concerning a claimant's ability to work." *Stout v. Comm'r*, 454 F.3d 1050,

1053 (9th Cir.2006). Lay witness testimony may be introduced "to show the severity of [Lee's]

impairment(s) and how it affects [her] ability to work." 20 C.F.R. § 404.1513(d); *Bruce*, 557

F.3d at 1115. To reject lay witness testimony the ALJ must provide specific and germane

reasons for doing so. *Id.* at 1115.

In finding Ms. Eastwood unpersuasive, the ALJ gave specific and germane reasons in

support of his determination. The ALJ explained that because Ms. Eastwood spends only 10

hours a month with Lee, often over lunch or coffee, and answered many of the questions on the

RFC form by indicating "don't know details," "unsure," and "unknown," the statements of Ms.

Eastwood were not found to be cogent. Tr. 28. The ALJ's citation to the record is specific,

Page 28 - OPINION AND ORDER

giving the exact reasons for why the ALJ found Ms. Eastwood to be unpersuasive, and the explanation given by the ALJ is germane to Ms. Eastwood's credibility as a witness. Therefore, the ALJ has met the legal standard for discounting the testimony of a lay witness and his decision will not be disturbed.

### C.    Opinions of the Vocational Expert

Lee argues that the ALJ erred by basing his findings, in part, on an incomplete hypothetical developed by the vocational expert ("VE") that does not accurately capture the severity of Lee's impairments or actual condition. Plaintiff's Brief, Doc. #16, pg. 30. Lee further asserts that the ALJ disregarded the VE's determination that Lee would not be capable of performing any jobs in the national economy when presented with a hypothetical that accurately reflected Lee's condition. *Id.*

In arguing that the ALJ's hypothetical analysis was incomplete, Lee is effectively reasserting the argument that the ALJ's RFC finding did not appropriately consider all of her symptoms, pathologies and limitations because the ALJ improperly discounted Lee's own testimony and the testimony of her treating physicians. *See Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1175-76 (9th Cir. 2008). I do not find this argument persuasive. As discussed above, the ALJ appropriately weighed the opinions of both Lee and her treating physicians, giving specific and legitimate reasons that are based on substantial evidence in support his findings. Therefore, I find that the opinion of the VE was appropriately considered by the ALJ and, contrary to Lee's theory of the case, is not grounds for reversing the ALJ's ultimate disability determination.

## III.    The Combined Effect of Lee's Impairments Do Not Meet or Equal a Listing

Lee argues that the ALJ did not properly evaluate the combined effect of Lee's medically

Page 29 - OPINION AND ORDER

verified impairments and consider whether, when taken together, Lee's impairments equal those enumerated in the Listings or result in disabling limitations. Plaintiff's Brief, Doc. #16, pg. 7.

The ALJ found that "[n]o physicians including examining or consulting physicians opined that the severe medically determinable impairments listed in Finding [failed back syndrome and obesity] either individually or in combination, meet or equal any of the listed impairments." Tr. 23. Because Lee has more than one impairment, the ALJ must determine "whether the combination of [the] impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526(a). To make this determination, Lee's symptoms "must be considered in combination and must not be fragmentized in evaluating their effects." *Lester v. Chater,* 81 F.3d 821, 829 (9th Cir.1995). The ALJ's equivalence determination is to be based on the medical evidence alone. 20 C.F.R. § 404.1529(d)(3).

Lee has offered no theory or argument as to how a combination of her impairments meet or exceed Listing 1.04 (disorder of the spine). Furthermore, Lee has not adduced medical evidence to show that her combined impairments equal a Listed impairment. Thus, the ALJ did not err in finding that Lee's impairments do not equal a listing defined within the C.F.R.

## IV.    ALJ's Consideration of The Record in its Entirety

Lee argues that the ALJ's decision was in error because it was based on an isolated and specific quantum of supporting evidence, without consideration of the record as a whole, where both the evidence that supports and the evidence that detracts are weighed. Plaintiff's Brief, Doc. #16, pg. 7. If the evidence can support either affirming or reversing the findings of the ALJ, the court may not substitute my own judgment for that of the ALJ's. *Tackett*, 180 F.3d at 1098 (9th Cir. 1999). However, "a reviewing court must consider the entire record as a whole and may not

Page 30 - OPINION AND ORDER

affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

Lee fails to materially support her argument that in making his disability determination, the ALJ isolated supporting evidence rather than properly considering the record as a whole. Lee advances no credible arguments and adduces no evidence showing that the ALJ only considered evidence in isolation. Rather, Lee disagrees with the ALJ's interpretation of some evidence and asserts that this evidence should be given a more favorable interpretation. Because there is no material evidence to suggest that the findings of the ALJ were made from evidence taken in isolation, the ALJ's disability determination is affirmed.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Lee's application for disability insurance benefits and supplemental security income is affirmed.

Dated this 5th day of August, 2016.

Honorable Judge Papak
United States Magistrate Judge

Page 31 - OPINION AND ORDER